IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MICHAEL G. BALDWIN,

   Plaintiff,

v.               Case No. 18-2390-JWB

CORECIVIC OF TENNESSEE, LLC,

   Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on Defendant's motion for summary judgment.  (Doc. 71.)
The motion has been fully briefed and is ripe for review.  (Docs. 72, 79, 84.)  For the reasons stated
herein, the motion for summary judgment is DENIED in part and GRANTED in part.

### I.  Facts

In keeping with the standards governing summary judgment, the following statement of
facts views the evidence, and all reasonable inferences therefrom, in the light most favorable to
the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (evidence
is viewed in the light most favorable to the non-moving party because credibility determinations,
weighing conflicting evidence, and drawing appropriate inferences are jury, rather than judge,
functions).  In addition and in accordance with Fed. R. Civ. P. 56(e)(2), facts proffered by
Defendant which are undisputed by Plaintiff have been accepted as true by the court for the
purposes of this analysis.

Defendant owns and operates the Leavenworth Detention Center in Leavenworth, Kansas
("the prison"), where Plaintiff served as a correctional officer from November 2009 to March 2017.

Defendant operated the prison pursuant to a contract with the United States Marshals Service, under the authority of the Service Contract Act, 41 U.S.C. §§ 351–58[1] ("the SCA"), which controls some of the terms of employment for prison employees.  In October 2014, Plaintiff filed a complaint with the United States Department of Labor ("DOL"), claiming that Defendant was not compensating its employees in accordance with the federal contract.  According to Plaintiff, this action triggered an onslaught of retaliation from prison management and other employees, including a threat against his life, ultimately resulting in his constructive discharge.

Defendant points out that Plaintiff's problems at the prison didn't start with the DOL complaint.  He was accused in 2010 of making racist comments to an African-American inmate, although he was not disciplined.  In addition, as Plaintiff acknowledged in his deposition, his 2011 performance evaluation noted that he had had verbal altercations with other staff.  His 2013 performance evaluation similarly noted that Plaintiff needed improvement in the areas of teamwork, collaboration and problem-solving.  In October 2013, Plaintiff filed a grievance with prison management over the paid leave policy.  (Doc. 73-4.)  The Warden responded that the policy was being applied correctly, and the grievance was denied at the second step.

In early 2014, Plaintiff submitted several "Incident Statements" to address various problems he was having at work, including a shortage of "chits," an inventory tool for keeping track of equipment; his dissatisfaction with food choices available to staff; and his concern about another corrections officer who was failing to handcuff certain inmates on visits to the prison nurse.  These were all resolved to Plaintiff's satisfaction.  Plaintiff does not dispute Defendant's factual assertions concerning the pre-DOL complaint time period, but argues that these events are immaterial to his present claims.

---

[1] These traditional section numbers were supplied by Plaintiff; the Act is now codified at 41 U.S.C. §§ 6701–07.

In the fall of 2014 Plaintiff contacted the Department of Labor to report the same issue that had been the subject of his grievance over paid leave the year before.  The parties dispute when Defendant learned of this DOL complaint.  At any rate, the Warden knew of the complaint no later than January 2015, when he called Plaintiff in for a meeting, along with the prison's chief of security.  The Warden asked Plaintiff what he thought he was doing, and told him nothing was going to change.  The Warden accused Plaintiff of being like a shopper in Walmart who pours water on the floor and then slips in it, and said Plaintiff had "very big balls for doing this."  (Doc. 79-12 at 5.)

Plaintiff was immediately assigned to work the perimeter/Unit 12 for most of the next eighteen months.  Plaintiff and Defendant disagree about the desirability of the new posting.  According to Defendant, a corrections officer assigned to the perimeter was able to spend the day driving around the outside of the prison property in an air-conditioned car, listening to the radio, with no contact with the often-abusive inmate population.  According to Plaintiff, the perimeter assignment was retaliatory because the car's air-conditioning and driver's seat were both broken, and he was not permitted to take a single break during his twelve-hour shift, including no bathroom breaks.  Plaintiff states further that employees assigned to the perimeter post usually got to split the shift with another employee, but that he was required to work the entire shift on his own, in complete isolation, with no relief.   Plaintiff's compensation and benefits were unchanged.

In January 2015, Plaintiff filed a grievance accusing Captain Ronda Ayers of harassment, stemming from her alleged anti-Semitism.  The incident concerned Ayers' threat to prevent Plaintiff from taking time off and to discipline him for doing so.  However, the Warden overruled Ayers, telling Plaintiff he could have some days off with pay, and promising that Ayers would receive retraining.   In March 2015, Plaintiff filed a grievance with the Human Resources

Department ("HR") against the prison's Learning and Development Manager, Sandra Elliott, who was responsible for all employee training.  During his initial training with Elliott, Plaintiff had gotten the impression that she thought he was smart, and maybe even was a bit intimidated by him. However, in March 2015, Plaintiff overheard Elliott telling some co-workers that she didn't like Plaintiff and that she was not going to permit him to take a break for the special meal served on Employee Appreciation Day.  Plaintiff believed this was retaliation because of his DOL complaint. Elliott claimed in her deposition that she had heard a rumor that someone contacted the DOL, but she did not know who.  (Doc. 80-1 at 4.)  It appears that this grievance was resolved to Plaintiff's satisfaction, as the Assistant Warden counseled Elliott on professional and appropriate communication.  Plaintiff does not dispute that there was no evidence linking Elliott's conduct to his DOL complaint.  (Doc. 79 at ¶ 72.)

Later in March 2015, Plaintiff filed another grievance; this one concerning an argument with Lieutenant Grayson.  Plaintiff and Grayson disagreed about whether or not an inmate could take a food tray from the kitchen.  When Plaintiff contradicted Grayson, the two got into a shouting match in front of inmates and coworkers which had to be broken up by the chief of security.  At the time, Plaintiff feared that Grayson was going to hit him, and he subsequently learned that Grayson told a coworker that he wanted to.  In his grievance, Plaintiff wrote that Grayson's conduct was part of a pattern of retribution against him resulting from the DOL complaint.  However, he admitted in his deposition that he had no evidence that the incidents were related.

In April, Plaintiff called in sick one day, and learned on his return to work that Lieutenant Lajiness had talked about his absence with his coworkers, telling them he planned to discipline Plaintiff.  Plaintiff filed a grievance stating that he feared he would be disciplined by Lajiness for calling in sick, in retaliation for his DOL complaint.  As a result, the chief of security met with

Plaintiff and Lajiness, and Plaintiff was not disciplined.  Although Plaintiff was pleased that he was not disciplined, he did not believe the underlying issue was resolved.

Plaintiff filed another preemptive grievance in May because he thought he was going to be disciplined for failing to complete a required inmate count sheet, which had not been timely delivered by Lieutenant West.  In the end, the parties concluded that West had made a mistake and was not setting Plaintiff up as retribution for his DOL complaint.  In June 2015, Plaintiff filed a grievance accusing Unit Manager Faynett Anderson of harassment and of creating a hostile workplace after she filed a sexual harassment complaint against Plaintiff.  Plaintiff states that this episode had nothing to do with his DOL complaint; instead it stemmed from the fact that she was interested in a relationship with him, but then accused him of stalking her.  The Assistant Warden's investigation of this incident resulted in Anderson being cleared of wrongdoing while Plaintiff was found to have been disrespectful and insubordinate.

During the summer of 2015, the Department of Labor completed its investigation into Plaintiff's complaint, concluding that, while Defendant was paying employees the required prevailing wage, it had failed to pay them for missed holidays and vacations.[2]  Consequently, Defendant agreed to retroactively compensate eighty-four employees a total of $25,562.13, according to the "WHISARD Compliance Action Report" from the DOL.[3]  (Doc. 79-2.)  The Report indicated that Defendant had agreed to remedy violations in two categories:  "Failure to

_____

[2] Defendant asserts that the DOL decision was not concluded until August 2015.  (Doc. 72 at ¶ 91.)  The DOL report, which is dated September 21, 2015, indicates that Plaintiff was notified of the results of the investigation on September 14.  The Report also states that affected employees received the back wages on September 10, 2015. Numerous contacts between DOL investigators and staff at the facility are recorded in the Report, starting as early as January 18, 2015.  (Doc. 79-2.)

[3] In his (unverified) complaint, Plaintiff asserts that Defendant owed "several hundred thousand dollars" in backpay, and was required to pay several hundred thousand more in fines. (Doc. 18 at ¶¶ 23–24.)  The DOL Report does not indicate any imposition of fees or fines on Defendant.  (Doc. 79-2.)  Plaintiff does not dispute Defendant's accounting of the amounts it was required to pay.

pay prevailing wage rate" ($21,115.81) and "Failure to pay required Health and Welfare (Fringe

Benefits)" ($4,446.32).   The "SCA Narrative" section stated that there was no prevailing wage

violation, but the section labeled "Fringe Benefits" included the following explanation:

> Violations were found when the employer failed to pay for missed holidays and
> vacations if they did not use their time they lost their time.  This was verified with
> interview statements.  (See exhibits B-1-9).  The fringe benefits were paid correctly
> for back wages purposes but for the missed time a total of 84 employees are due
> $25,562.13.  These were paid on September 10, 2015.

Plaintiff received $64.98.

The DOL Report also includes a section labeled "FLSA Narrative."  "FLSA" refers to the

Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*  (Doc. 79-2 at 9.)  It appears from the Report

that the Department of Labor expanded its investigation to check for a violation of this Act, in

addition to checking for violations of Defendant's contract.  This section of the Report reveals no

violations in the areas of minimum wage, overtime pay, and child labor laws.  A "Record Keeping"

violation was noted as: "Violations occurred in the SCA investigation as the contractor did not

record and pay proper fringe benefits and prevailing wages."  The "Recommendation" stated:  "As

the firm's attorney, Susan Lindsey agreed to future compliance and no violations were found it is

recommended that this case is closed upon review."

Finally, the Report also includes a summary of Plaintiff's initial complaint.  As Plaintiff

did not retain any of his own records, this is the only documentary evidence the court has of

Plaintiff's claim.  The section labeled "Complaint Notes" states, in full:

> Complainant alleges that this private company owns approximately 21 federal
> corrections centers around the country; all facilities except the aforementioned pay
> detention guards prevailing wage rates of approximately $28.13 per hour plus
> fringes; security guards at this facility are paid $18.79 per hour and only receive
> vacation benefits; Complainant state that an audit was conducted recently of a
> company owned facility in California City, Calif., for the same alleged reason as
> guards were paid prior to audit approx. $18.00 per hour and no fringes; he stated
> that the firm paid back wages to the guards and he thinks wage hour conducted the

audit; Corrections Corporation of America is the home office and is located in
Nashville, Tenn., local facility has over 100 security guards; other occupations that
may be affected would be maintenance and clerical staff

(Doc. 79-2 at 13.)

Meanwhile, back at the prison, on June 25, 2015, the Warden called a staff meeting, where
he referred to Plaintiff as the "shop steward," and told the assembled employees that the facility
might have to close if Plaintiff "keeps it up." (Doc. 79 at ¶ 42.)  Following this meeting, several
of Plaintiff's coworkers, including Robin Moore and Deanna Volle, called Plaintiff a "rat" and
"Jimmy Hoffa."  It was in July 2015 that Plaintiff was instructed that he could no longer take any
breaks during his 12-hour perimeter shift.  Also in July, Elliott told a training class that they should
avoid troublemakers at the prison who were "trying to destroy the company."  This warning, during
a PowerPoint presentation to new hires, was accompanied by a photograph of Plaintiff.

In September, Plaintiff had another issue with a co-worker, Charlotte Clarke.  When
Plaintiff saw Clarke removing her shirt in the parking lot, he warned her that inmates in the
segregation area could see her from their windows.  Later, Plaintiff jokingly asked her when she
planned to take her clothes off next so he could arrange to be there.  After Clarke complained about
this comment to management, an investigation cleared Plaintiff of wrongdoing.  According to
Plaintiff, Clarke was ultimately fired when it came to light that she was married to an inmate.

In October 2015, Plaintiff filed another grievance against Sandra Elliott, alleging that she
was bullying him and disparaging him to other co-workers and inmates, because of his DOL
complaint.  Plaintiff alleged that management was trying to create division between him and his
coworkers, upon whom he had to depend for his safety and security while on the job.  The
grievance was investigated by the chief of security, who was unable to substantiate Plaintiff's
claims.  Plaintiff filed a second grievance against Elliott the following month when he learned that

she had warned new employees to avoid Plaintiff.  This remark was corroborated, and Elliott was advised by the security chief not to use specific staff members as examples in her training.

Plaintiff asserts that the Warden knew about all these grievances.  Nevertheless, none of his complaints were reported to the Ethics Office or the legal department, as Plaintiff maintains was required by prison policy.  Defendant disputes that these reports up the management chain were required by the company's grievance procedure.  Defendant asserts, and Plaintiff disputes, that the Warden was authorized to determine whether a grievance warranted referral to an investigator. (Docs. 73-3, 79 ¶ 27).   Defendant points out further, and Plaintiff does not dispute, that Plaintiff never appealed the outcome of the grievances.   The company's confidential "Escalation and Notice Guidelines" require that all allegations of workplace retaliation or retribution be reported to the ethics office, while other matters may be resolved at the facility level. (Doc. 78-1.)

Things at work seemed quieter for Plaintiff through most of 2016.  In April 2016, facility investigator Deborah Kinney asked him, in connection with a drug smuggling investigation, if he didn't think he'd "done enough" – despite the fact that Plaintiff had nothing to do with the investigation.   Plaintiff's September 2016 performance evaluation stated that he exceeded expectations in one category, and met them in all the others.  However, Plaintiff has stated that, originally, he received 'exceeded' ratings in several categories, but, two weeks later, management instructed the ratings be lowered.

Around this time, Plaintiff reported to Captain Daniels that he believed a member of the prison's maintenance crew had stolen two used fuel tanks, and that another employee, Larry Easter, had stolen a car carrier hitch.  Plaintiff's suspicions were based on information given to him by another employee in previous years.  Daniels submitted an incident report in October 2016 and the

allegations were investigated by Regional Investigator Gordon Harpe.  Plaintiff asked, and was assured, that his role would be kept confidential.  Nevertheless, it was soon clear to Plaintiff that word had gotten out that he had triggered the investigation, and a campaign of harassment against him commenced.  First two coworkers approached him and told him they knew he was the source of the theft complaint, accusing him of causing trouble again.  Then the air was let out of Plaintiff's car tires on multiple occasions.  Easter began glaring at Plaintiff without speaking.  Coworkers advised Plaintiff to stay away from the company's Christmas party in case the people he had "ratted out" were drinking there.  Another coworker told Plaintiff, "Snitches end up in ditches."  (Doc. 79-12 at 30.)  Plaintiff received harassing telephone calls at his home, with the caller usually hanging up as soon as Plaintiff picked up.  On one occasion, the caller left a message, warning that Plaintiff was going to pay one day.  Plaintiff also found a dead mouse on his car in the prison parking lot.

In the meantime, Harpe's investigation into the thefts unearthed no wrongdoing.  The fuel tanks had reportedly been donated to a local junior college.  And the car carrier hitch was indeed in the possession of Easter, who had taken it after it was authorized for disposal by the Warden in 2014.  In January 2017, Plaintiff filed a grievance about the theft investigation and his distress over the fact that his role in it had been revealed to his coworkers.  Plaintiff recounted the various incidents of harassment, concluding that the incidents were related both to the investigation and the DOL complaint.  However, the Warden determined that no discipline was appropriate for anyone involved in these incidents who had been identified.  The Warden sent an email to all prison staff reminding them that employees had the right to work in an environment free from harassment and intimidation.

Soon after, an inmate told Plaintiff that he had heard a rumor that there was a contract out on Plaintiff and that anyone who "shanked" him would get $100. Plaintiff notified his supervisor of the threat. Plaintiff testified at his deposition that he had observed violent acts while employed at the prison, and that he knew that inmates threatened guards and tried to intimidate them. Nevertheless, Plaintiff was unnerved by this report, and decided to take a leave of absence on January 24, 2017. Although Plaintiff hoped to return to work at the prison, he also looked for another job while on leave. He applied for, and was offered, a position with a juvenile detention center, noting on his application that he was interested in finding a job closer to his home. On February 20, Plaintiff sent Defendant a letter of resignation indicating that his final day would be March 5.

On March 6, 2017, Plaintiff started his new job as a Youth Care Advisor. He was fired on March 24, due to inappropriate comments he made, or was falsely accused of making, to other staff members. Plaintiff told one of his new coworkers that she reminded him of his first wife because they both worked with special needs children. He also told a coworker that housewives do not make good prison guards. Another coworker claimed Plaintiff said that he imagined someone they worked with would be "a tiger in bed" and "I love my wife very much but a man gotta do what a man gotta do." Plaintiff denies making these last two statements.

On August 25, 2017, Plaintiff filed a lawsuit against Defendant alleging a violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). He dismissed this suit in July 2018, when the United States declined to intervene. (Doc. 72-1 at 123–25.) *See* D. Kan. 2:17-cv-2489-JAR-GEB, Docs. 1, 7. He filed the present lawsuit immediately thereafter.

**II.  Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc*., 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol-Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Id*. The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In cases where a claimant describes fact-intensive allegations such as discrimination, harassment, or constructive discharge, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1220–21 (10th Cir. 2015) (quoting *Randle v. City of Aurora,* 69 F.3d 441, 453 (10th Cir.1995)); *see also Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009) ("[J]udgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation.").

### III. Analysis

Plaintiff has filed a four-count amended complaint, all stemming from Defendant's alleged retaliation against him – including harassment, assignment to an undesirable job duty, and constructive discharge – resulting from conduct Plaintiff characterizes as legally-protected whistleblower activities. (Doc. 18.)   Count I alleges that Defendant retaliated against him for

conduct that is protected under the federal False Claims Act, 31 U.S.C. §§ 3729–30, that is, notifying the Department of Labor that Defendant was violating its federal contract.  Count II claims retaliation for the same conduct, which Plaintiff alleges is also protected under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*  In Counts III and IV, Plaintiff alleges that he was constructively discharged in violation of Kansas state public policy, which protects Plaintiff's conduct in connection with his report to the DOL (III), as well as his report of employee theft at the prison (IV).  Plaintiff seeks economic damages, including back pay and lost benefits, compensatory damages for, *inter alia*, his emotional distress, and punitive damages.  Defendant moves for summary judgment in its favor on all counts.

### A.   Count I – False Claims Act retaliation

Plaintiff asserts that Defendant made false claims to the U.S. government when it sought payment pursuant to its contract, while knowing that it was not in compliance with the contract because it was not paying its employees required fringe benefits.  Plaintiff claims further that, when he reported this violation, first in the form of an internal grievance and then in his DOL complaint, Defendant retaliated against him with a campaign of harassment, an undesirable new assignment, and other tactics designed to undermine his relationship with his coworkers, on whom he needed to depend for safety and security in the volatile prison environment.

The False Claims Act ("FCA") was enacted to encourage public reporting of fraudulent claims for payment made to the United States government, by, *inter alia*, protecting whistleblowers from retaliation.  *U.S. ex rel. Reed v. Keypoint Gov't Solutions*, 923 F.3d 729, 736 (10th Cir. 2019).  In order to establish a *prima facie* case of retaliation under the FCA, a claimant must present evidence sufficient to support a finding that he engaged in protected activity, of which the defendant was put on notice, and that the defendant retaliated because of that protected activity.

*Id.* at 764.  Defendant argues that Plaintiff's FCA claim fails as a matter of law because he fails to make a sufficient evidentiary showing on each prong.

Defendant first argues that Plaintiff's conduct in filing the DOL complaint is not protected activity under the statute.  Because Plaintiff did not actually file an FCA lawsuit until after he had been fired from the juvenile detention center job, Defendant argues that Plaintiff's DOL complaint was not filed "in furtherance of" an FCA enforcement action, as required by the statute, 31 U.S.C. § 3730(h)(1).  However, conduct in furtherance of an FCA action is not limited to the actual filing of a lawsuit, but also includes activities that could reasonably lead to such an action.  *Id.* at 765; *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 704 (10th Cir. 2012)*; Lipka v. Advantage Health Group, Inc.*, No. 13-cv-2223, 2013 WL 5304013, at *6 (D. Kan. Sept. 20, 2013) (citing *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 237 (1st Cir. 2004)).  The scope of activities protected from retaliation by the FCA is subject to broad interpretation; "an employee is not required to have 'developed a winning claim' under the FCA at the time of the alleged retaliation."  *Lipka*, 2013 WL 5304013, at *4 (quoting *Schuhardt v. Washington Univ.*, 390 F.3d 563, 567 (8th Cir. 2004)).  In fact, "an employee need not even be aware of the existence of the FCA to engage in protected activity under the FCA. . . ."  *Id.*; *United States ex rel., Schweizer v. Oce N.V.*, 677 F.3d 1228, 1238 (D.C. Cir. 2012).

Not every claim of wrongdoing or regulatory violation can provide the substance for a cause of action under the FCA.  *United States ex rel., Conner, M.D. v. Salina Regional Health Ctr., Inc.*, 459 F. Supp. 2d 1081, 1086 (D. Kan. 2006).  The FCA claimant must be able to show that the defendant presented a claim to the government for reimbursement that was knowingly false or fraudulent.  *Id.* at 1085–86; *United States ex rel., Golden v. Arkansas Game & Fish Com'n*, 333 F.3d 867, 870 (8th Cir. 2003); *United States ex rel., Hopper v. Anton*, 91 F.3d 1261, 1266 (9th

Cir. 1996).  False certification to the government may also be implied through the employer's misleading presentation of half-truths, or simply by omitting certain information concerning violations of contractual requirements.  *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1999 (2016).

In his complaint, Plaintiff alleges that Defendant was paid by the month by the federal government, and that payment was contingent upon Defendant's representations that it was complying with the terms of the contract.  A portion of his filing in connection with his internal grievance of October 2013 alleges that Defendant breached its contract and its fiduciary obligations to the U.S. Marshals service by failing to pay its employees in accordance with the SCA contract.  (Doc. 73-4 at 7.)  This filing demonstrates further that Defendant amended its time-off timekeeping policy prospectively in June 2013, but intended no other changes to the implementation of the policy.  The grievance filing, and the DOL Report both outline the documentation that Defendant had to file with the government in accordance with the SCA. (Docs. 73-4 and 79-2.)  The court holds that Plaintiff has presented evidentiary support that his DOL complaint was made in connection with a claim that could have ripened into an FCA claim, sufficient to create a genuine dispute of fact as to whether his conduct is protected from retaliation under the Act.

Second, Defendant argues that Plaintiff has not shown that it was put on notice that he was taking action to pursue a potential FCA action.  This argument falls short for several reasons.  First, Plaintiff's internal grievance served to notify Defendant that there were concerns about its time and record-keeping protocols.  Just as an employee need not be familiar with the FCA in order to engage in conduct in furtherance of an investigation, that employee need not explicitly inform his or her employer about the prospect of an FCA suit.  *McBride*, 688 F.3d at 704; *Schweizer*, 677

F.3d at 1238 ("[T]he employer may incur liability under § 3730(h) even if the employer has no

inkling that a False Claims Act suit may be in the offing."); *Lipka*, 2013 WL 5304013, *4.  Second,

while the statute requires that the employer must have knowledge of a possible lawsuit in order to

support a retaliation claim, the statute does not require that the notice be provided by the claimant.

*See Schuhardt*, 390 F.3d at 568 ("A plaintiff must show the employer had actual or constructive

knowledge of the protected activity in order to establish a prima facie case of retaliation.").  Here

the record shows that during the time that Plaintiff alleges he was being harassed by Defendants

and its employees, the DOL was conducting the investigation triggered by Plaintiff's complaint,

including interviewing Defendant's employees, which investigation had been undertaken at least

as early as January 2015, and that Defendant knew that Plaintiff's complaint triggered the DOL

investigation. (Doc. 79-2.)   Consequently, the notice requirement is sufficiently fulfilled to avoid

summary judgment based on this prong of the *prima facie* case.

   Finally, Defendant argues that Plaintiff cannot make a *prima facie* case of FCA retaliation

because it never retaliated or took an adverse employment action against him.  Plaintiff alleges in

his complaint that, soon after filing his DOL complaint, the Warden called him into his office,

asked him what he thought he was doing, accused him of being like a litigious Walmart shopper,

and told him he had "big balls" for making the complaint, and that nothing was going to change.

The Warden then expressed his dissatisfaction with Plaintiff at a company-wide meeting, where

he told Plaintiff's coworkers that the prison might be shut down if Plaintiff kept up his

complaining.  His coworkers began to call him names after this public dressing-down.  Plaintiff

was assigned to the allegedly undesirable position of patrolling the prison's exterior perimeter,

with no breaks during his 12-hour shift and no relief.  The prison's training manager, Sandra

Elliott, instructed new employees to avoid Plaintiff because he was a trouble-maker and

incorporated his photo into her introductory PowerPoint presentation.  Plaintiff finds further evidence of intentional retaliation because Defendant's managers failed to refer his various grievances, most of which stated that the complained-of mistreatment was in retribution for his DOL complaint, up the management chain to the company's investigative team.  Later, according to Plaintiff, his identity was leaked in connection with his confidential report of employee theft, resulting in a campaign of harassment presumably from his coworkers, who, among other things, let the air out of his car tires repeatedly, made prank phone calls to his home, threatened him, told him to stay away from the company holiday party for his own safety, put a dead mouse on his car windshield, and possibly even talked to an inmate about "shanking" him.

The Tenth Circuit has held that, in some instances, a "reassignment with significantly different responsibilities" might constitute an adverse employment action.  *Tapia v. City of Albuquerque*, 170 Fed. App'x 529, 533 (10th Cir. 2006).  The *Tapia* court acknowledged that, while defining an adverse employment action was "inherently a fluid and fact-based consideration," "a mere inconvenience or an alteration of job responsibilities will not suffice."  *Id.*, (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)); *see Davis v. Unified Sch. Dist. No. 512*, No. 18-3199, 2019 WL 8138566, *3 (10th Cir. Nov. 7, 2019) (collecting cases on retaliatory reassignments).  The court determines that there is a genuine factual dispute about the circumstances, significance, and severity of Plaintiff's reassignment to perimeter patrol.

As to the other events, together they form a picture which could be characterized by a jury as harassment or discrimination "in the terms and conditions of employment."  31 U.S.C. § 3730(h)(1).  This kind of analysis requires an assessment of all the circumstances and is "particularly unsuited for summary judgment because it is inherently fact-found by nature."  *Lounds*, 812 F.3d at 1222 (citing *O'Shea v. Yellow Tech Servs., Inc.*, 185 F.3d 1093, 1098 (10th

Cir. 1999) (internal quotations omitted)).  The link between the alleged harassment and Plaintiff's DOL complaint was made explicit in remarks addressed to the work force by the Warden and training manager Elliott.  These actions raise a reasonable inference of a retaliatory motive.  The court holds that, as with the other prongs of the *prima facie* case of FCA retaliation, Plaintiff has put forth sufficient evidence to create triable issues of fact suitable for a jury's consideration.[4]  Consequently, the court denies Defendant's motion for summary judgment as to Count I of the amended complaint.

### B.   Count II – Fair Labor Standards Act retaliation

Plaintiff claims that Defendant's conduct also constitutes a violation of the Fair Labor Standards Act's prohibition against retaliation, 29 U.S.C. § 215(a)(3).  The FLSA establishes minimum wage requirements, restrictions on maximum hours, and prohibitions against child labor.  29 U.S.C. §§ 206, 207, and 212.   A *prima facie* case of retaliation, similar to the FCA, requires a showing that a claimant made an FLSA complaint or otherwise engaged in protected conduct; the defendant was aware of that conduct and, consequently, took an employment action that was materially adverse to the claimant.  *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004).

Defendant argues that Plaintiff did not engage in conduct protected by the statute because his DOL complaint concerned unpaid vacation time – not a topic covered by the FLSA.  But the FLSA imposes upon employers a requirement for accurate time and wage record-keeping.  29 U.S.C. § 211(c); 29 C.F.R. §516.2; *see also Acosta v. Jani-King of Okla., Inc.*, 905 F.3d 1156,

---

[4] Defendant argues that Plaintiff has failed to make a *prima facie* case of retaliation.  In connection with the work reassignment and its other alleged harassment, Defendant argues that the assignment was a plum, that it was within in its managerial authority to make such an assignment.  Defendant argues that the other events are not material.  Because Defendant offers no non-retaliatory rationale for its conduct, the burden of demonstrating retaliatory motive does not shift back to Plaintiff to show pretext.  Consequently, the court does not pursue the customary analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  *See Crookston v. Doctor's Inc.*, No. 16-2071-JTM, 2017 WL 2439374, at *3 (D. Kan. June 6, 2017).

1160–61 (10th Cir. 2018);  *Olson v. Superior Pontiac-GMC, Inc.*, 776 F.2d 265, 266 (11th Cir.

1985); *Kline v. Wirtz*, 373 F.2d 281, 282 (5th Cir. 1967).  Moreover, the DOL Report reflects

that the investigator reviewed Defendant's practices to ensure that it was compliant with the

FLSA, finding, under the section titled "FLSA Narrative," that "the contractor did not record and

pay proper fringe benefits and prevailing wages."  (Doc. 79-2 at 9).  This is sufficient to pose a

genuine issue of material fact as to whether Plaintiff's DOL complaint constituted protected

conduct under the FLSA.  *See Kasten v. Saint–Gobain Performance Plastics Corp.,* 563 U.S. 1,

14 (2011).

Defendant argues further, in reliance on its earlier arguments in connection with the FCA,

that Plaintiff cannot demonstrate an adverse employment action or a link between his conduct

and the employer's actions.  The court refers the reader back to Section B's discussion *supra*

regarding Defendant's alleged harassment and its connection to Plaintiff's DOL complaint.  The

evidence of harassment and causality suffice to create a triable issue of fact as to whether

Defendant retaliated against Plaintiff as a result of his DOL complaint in violation of the FLSA

prohibition against retaliation.

### C.   *Counts III and IV – constructive discharge in violation of Kansas public policy*

In these two counts, Plaintiff claims that his two separate instances of whistleblower

conduct – reporting Defendant's time-keeping violation to the DOL and reporting the suspected

employee thefts to prison management – should be protected under Kansas common law as an

expression of the State's public policy.  Generally-speaking, Kansas endorses the doctrine of at-

will employment, which means that, in the absence of a contract, "either party is free to end the

employment at any time for any reason."  *Palmer v. Brown*, 752 P.2d 685, 687 (Kan. 1988); *see*

*also Flenker v. Willamette Ind., Inc.*, 967 P.2d 295, 298 (Kan. 1998).  The Kansas Supreme Court

has carved out some exceptions to this doctrine when an employee has been terminated for discriminatory reasons or in retaliation for exercising rights that are protected by law. *See Pfeifer v. Fed. Exp. Corp.*, 304 P.3d 1226, 1234 (Kan. 2013); *Campbell v. Husky Hogs, LLC*, 255 P.3d 1, 7–8 (Kan. 2011); *Larson v. Ruskowitz*, 850 P.2d 253, 257–58  (Kan. 1993); *Palmer*, 752 P.2d at 689–90.  In the case before the court, Plaintiff was not terminated by Defendant, but claims that he was constructively discharged; that is, Defendant made his working conditions so intolerable that he was forced to resign.  *See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004).

To date, the Kansas Supreme Court has not recognized constructive discharge as a basis for a claim for retaliatory termination.  *See Marinhangen v. Boster, Inc.*, 840 P.2d 534, 539 – 40 (Kan. Ct. App. 1992); *Busey v. Bd. Of Cty. Com'rs of Shawnee Cty., 2004 WL 1965673, *5* (D.C. Kan. 1998) ("[T]he court does not believe that the Kansas Supreme Court would recognize a constructive discharge as sufficient to state an actionable retaliatory discharge claim."); *Diepenbrock v. Bd. Of Educ.*, No. 19-1212-PFK, 1994 WL 613421, at *8 (D. Kan. Oct. 4, 1994). Under the circumstances, this court declines to make a prediction about future rulings of the Kansas Supreme Court on retaliatory constructive discharge.  Based on current Kansas law, Defendant is entitled to summary judgment on these counts.

### IV.  Conclusion

For the reasons stated above, Defendant's motion for summary judgment is DENIED as to Counts I and II, and GRANTED as to Counts III and IV.  (Doc. 71.)

IT IS SO ORDERED this 23rd day of April, 2020.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE